**UNITED STATES of America, Appellee,**

v.

**Tito SANTANA–CAMACHO,
Defendant, Appellant.**

No. 86–1898.

United States Court of Appeals,
First Circuit.

Heard Sept. 10, 1987.

Decided Nov. 12, 1987.

Rafael Yulian Pomar, Santurce, P.R., by Appointment of the Court, for defendant, appellant.

Jorge E. Vega-Pacheco, San Juan, P.R., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., and Luis A. Plaza, Asst. U.S. Atty., were on brief, for appellee.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BREYER, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

Appellant Tito Santana-Camacho ("Santana") was charged and convicted of the offense of transporting within the United States an illegal alien, by means of a motor vehicle, in violation of 8 U.S.C. § 1324(a)(2) (1982).[1] He was sentenced to serve a year in prison and to pay a fine of $1,000.

---

* Of the Third Circuit, sitting by designation.

1. At the time the offense was committed, 8 U.S.C. § 1324(a)(2) read as follows:

    (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

    .    .    .    .    .

    (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of trans-portation or otherwise, in furtherance of such violation of law; ...

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employ-

The principal issue on appeal is whether it was plain error for the prosecutor to tell the jury—without record support, and to all appearances, incorrectly—that Santana himself had entered the United States illegally.

## I. FACTS

In 1986, when the alleged crime occurred, Santana, a citizen of the Dominican Republic, was legally residing in Puerto Rico. The alien he is charged with illegally transporting was one Jesus Matos-Reynoso ("Matos"), also a citizen of the Dominican Republic.

The government's case-in-chief was put in principally through three witnesses, whose essential testimony was as follows.

Police officer Mendez-Zayas ("Mendez") testified that on the morning of May 14, 1986, in San Juan, Puerto Rico, he stopped a car driven by Santana in which Matos was a passenger. The car was going the wrong way on a one-way street. Santana did not produce a valid driver's license, but he did show his immigration papers to the officer. When Mendez asked Matos if he had an immigration card, Matos replied that he did not have any papers. They were thereupon arrested.

Matos testified that he had entered the United States illegally in a yawl through Aquadilla, Puerto Rico, about two months prior to the arrest. He said he met Santana four years ago in the Dominican Republic and that he had been living at Santana's house for the last two weeks. On cross-examination he asserted that he had never told Santana of his illegal status in Puerto Rico or of the day of his entry into the United States. While staying at Santana's house, Matos was paying no rent. He paid only for his food.

Felipe Ferrer, a special agent for the anti-smuggling unit of the Immigration Service in San Juan, testified that on May 14, 1986, Santana and Matos were referred to him by the police. He interviewed both of them. In a sworn statement Matos stated that he was illegally in the United States and that he had entered the United States sometime during February 1986 on a motor boat. Also in a sworn statement, Santana indicated he had entered the United States *legally* in a motor boat in 1981, that on the date he was arrested he was on his way to work, and that (referring to Matos) he had picked up a person whose name he did not know.

Santana's defense consisted of his own testimony and that of a character witness. Santana testified that he did not know Matos was illegally in Puerto Rico until they were arrested. He asserted that Matos never told him when and how he had entered the United States. The day of the arrest he and Matos were searching for jobs. Santana admitted that he knew Matos from the Dominican Republic, that Matos had been staying at his house, and that he, Santana, had lied to the immigration agent when he said that he did not know Matos. Santana explained that he had lied because he became afraid after first learning at the time of the arrest that Matos was not legally in Puerto Rico. The character witness, Ana M. Resto, testified that she was a neighbor of Santana, that she had known him for at least two years, and that she was of the impression he was an honest man.

Santana at no time presented a motion for judgment of acquittal under Fed.R. Crim.P. 29.

## II. THE PROSECUTOR'S REMARKS

Santana contends on appeal that the prosecutor made two improper and prejudicial remarks in his closing argument to the jury. Emphasizing that Santana must have known of Matos's illegal entry and status, the prosecutor said,[2]

We submit to you that when you reside with a person for that length of time you

---

ment) shall not be deemed to constitute harboring.

**2.** Knowledge by a defendant that the alien he is transporting was illegally in the United States and that the alien had entered the country with-

in the last three years are elements of the charged crime. *See* footnote 1, *supra; United States v. Gonzalez-Hernandez,* 534 F.2d 1353, 1354 (9th Cir.1976).

talk. Especially a person in a case *where the evidence showed that he himself had entered illegally back in 1981, also in a yawl.* Can we believe they could not talk? So the real issue is one of credibility.

(Emphasis supplied.) The statement that Santana had himself entered *illegally* is unsupported in the record and, indeed, contrary to the only evidence on the subject, which was Santana's own testimony that he had entered *legally* in 1981.

The prosecutor also argued,

Now, Title 8, Section 1324, has been established by the Congress for the specific purpose of protecting citizens of the United States from the very act that the defendant Tito Santana Camacho committed with Jesus Matos Reynoso, to prevent illegal aliens from taking jobs away from people that are here legally.

Santana contends that this argument was unduly inflammatory in a country like Puerto Rico which has a high unemployment rate; also that it reinforced the prejudicial effect of the prosecutor's earlier mistaken reference to Santana's own supposed illegal entry in 1981. While this remark standing alone may well have been deemed harmless, particularly in the absence of an objection by Santana, we view it as far more troublesome when considered in combination with the more egregious and incorrect statement regarding Santana's illegal entry.

■ The principal issue before us is whether the prosecutor's error in mischaracterizing defendant's own entry into the United States as "illegal" amounted to plain error within Fed.R.Crim.P. 52(b). Under Fed.R.Crim.P. 51, a party is expected

at the time the ruling or order of the court is made or sought, [to make] known to the court the action which that party desires the court to take....

At the time the Assistant United States Attorney misrepresented the evidence concerning Santana's status, Santana's counsel should have pointed out the mistake to the district court and requested corrective action. Had he done so, the district court would doubtless have cleared up the mis-

take, and, failing that, redress on appeal would have been easily obtainable. Unfortunately, however, no objection whatever was registered. Where a defect in the trial slips by unchallenged, this court will not normally consider it on appeal. But a narrow exception exists to this otherwise universal rule in Fed.R.Crim.P. 52(b), which reads as follows,

*Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

The question here is whether the prosecutor's remark was so destructive of Santana's basic right to a fair trial as to constitute plain error. *See United States v. Turano,* 802 F.2d 10, 12 (1st Cir.1986). In resolving this issue, we begin with the premise that,

The plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."

*United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (citing *United States v. Frady,* 456 U.S. 152, 160, 102 S.Ct. 1584, 1590–91, 71 L.Ed.2d 816 (1982)).

But while plain error is rare, it can occur. Here, we find no fault with the trial judge, who was entitled to assume that the prosecutor would not misstate the evidence and that, if he did, defense counsel would call the misstatement to the court's attention. Nonetheless, we conclude that the misstatement was so major and so prejudicial that it could have caused a miscarriage of justice. Hence we find plain error and reverse.

■ To determine whether the prosecutor's misstatement amounted to plain error, it must be viewed within the context of the entire trial. "[T]he court must consider the probable effect the prosecutor's [remarks] would have on the jury's ability to judge the evidence fairly." *United States v. Young,* 470 U.S. at 12, 105 S.Ct. at 1045.

In the instant case, the evidence is extremely weak on the essential element of

Santana's knowledge that Matos was an illegal alien who had entered the United States within the last three years. The proof is perhaps even weaker that Santana was transporting Matos "willfully in furtherance of the alien's violation of the law." *United States v. Gonzalez-Hernandez*, 534 F.2d 1353, 1354 (9th Cir.1976) (emphasis supplied). The government relies for proof of these matters upon the circumstantial evidence that Santana had met the illegal alien in the Dominican Republic several years ago, that since entering Puerto Rico the illegal alien had been staying at Santana's house, and that they were in the car together searching for jobs when arrested. There was also evidence that Santana had lied to the immigration agent when, after the arrest, he was asked if he knew Matos. As to this, however, Santana offered the explanation that he lied because he had learned for the first time during their arrest of Matos's illegal status (*i.e.*, when Matos told the officer he was without papers). Matos himself, who was the government's principal witness, testified that he had never told Santana that he was illegally in the country or when he had entered the country.

█ Given this record, the prosecutor's misrepresentation that Santana had himself been an illegal alien in 1981 is likely to have had a major impact upon the jury, causing it to believe that Santana undoubtedly knew of Matos's illegal status and was willfully aiding him when they were stopped. The assertion that Santana had entered illegally was the sort of official information an Assistant United States Attorney would be presumed to know—hence the jurors could readily have accepted the statement at face value. Once believing that Santana had himself entered illegally, the arguments that Santana did not know that Matos had entered illegally, and that Santana was not knowingly attempting to

help an illegal alien, might have seemed unbelievable.

To be sure, the extensive prior contacts between Santana and Matos provided some basis in common sense for suspecting that Santana knew of the latter's illegal status. Whether, standing alone, such circumstantial evidence would be legally sufficient to have supported a conviction is a matter we need not decide.[3] If sufficient, the proof was barely so. This can be seen by comparing the government's evidence here and its evidence in other cases where convictions for this particular "transportation" offense have been upheld. *See, e.g., Gonzalez-Hernandez*, 534 F.2d at 1353 (defendant was paid to transport illegal alien; no dispute as to defendant's knowledge of illegal status of alien); *United States v. Shaddix*, 693 F.2d 1135 (5th Cir.1982) (defendant told Hispanic individuals near border to hide in the brush until nighttime when they would be picked up by someone in a car who would honk twice).

Cases like the above may also be compared with others where, notwithstanding evidence somewhat stronger than is present here, the convictions were not sustained. *See, e.g., United States v. Tapia*, 761 F.2d 1488 (11th Cir.1985); *United States v. Moreno*, 561 F.2d 1321 (9th Cir. 1977). While we need not decide whether in all respects we would agree with the Ninth and Eleventh Circuits in the above two cases, they serve to suggest the fragility of the government's present case.

Clearly, then, the prosecutor's misstatement was no mere incidental embellishment to an otherwise powerful case. The prosecutor's erroneous remark strongly fortified the government's theory. Without that remark, it is not clear that the jury would have found beyond a reasonable doubt that defendant was guilty.

This court has found plain error when the prosecutor's statements could have been interpreted as a comment on the fail-

---

**3.** In the instant case, since appellant did not raise the issue of sufficiency of the evidence before the district court, it cannot be considered on appeal unless the conviction is "clearly and grossly unjust." *United States v. Lopez*, 709 F.2d 742, 746 (1st Cir.1983). *See also United States v.*

*Valencia-Copete*, 792 F.2d 4, 5 (1st Cir.1986). Because we have found plain error, we do not have to reach the issue of the sufficiency of the evidence under the "clearly and grossly unjust" standard. *Cf. United States v. Tapia*, 761 F.2d at 1491–92.

ure of the defendant to take the stand, *Rodriguez–Sandoval v. United States,* 409 F.2d 529 (1st Cir.1969), and when the judge has misstated the law in his charge to the jury, "even though the evidence against the appellant was strong," *United States v. Aitken,* 755 F.2d 188, 194 (1st Cir.1985). In other cases where we have not found plain error, the evidence against the defendant was stronger than here. *United States v. Mandelbaum,* 803 F.2d 42, 46 (1st Cir.1986); *United States v. Paradis,* 802 F.2d 553, 559–60, 561 (1st Cir.1986); *United States v. Cortez,* 425 F.2d 453 (1st Cir. 1970).

The present case is clearly distinguishable from *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1, where the Supreme Court concluded that the prosecutor's rebuttal comments were not plain error. The remarks there had been invited by defense counsel's misconduct during his closing argument. The statement in *Young* did not suggest that the prosecutor was relying on evidence outside the evidence presented at trial. *Id.* at 19, 15 S.Ct. at 1049. Finally, there was substantial evidence in *Young* to sustain the conviction:

> The overwhelming evidence of respondent's [guilt] eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the government's prestige in the eyes of the jury. Not a single witness supported respondent's asserted defense ... and several witnesses flatly rejected such propositions.... Under these circumstances, the substantial and virtually uncontradicted evidence of respondent's willful violation provides an additional indication that the prosecutor's remarks, when reviewed in context, cannot be said to undermine the fairness of the trial and contribute to a miscarriage of justice.

*Id.* In the instant case there is an absence of those ameliorating circumstances that were present in *Young.* Here the prosecutor's remark was not made in response to any improper statement made by defense counsel. The remark lacked any basis in the evidence and, indeed, contradicted the evidence. We conclude that there is indeed a "lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Id.*

*The judgment of conviction is vacated and the case remanded for further proceedings not inconsistent with this opinion.*